SUTTER v. BIGGS.

Opinion of the Court.

1. Physicians and Surgeons—Malpractice—Instructions—Unau-
thorized Salpingectomy and Ovariectomy.

Instruction in malpractice action against surgeon who had re-
moved plaintiff's right fallopian tube and ovary without
parental authority when performing appendectomy upon her
when she was 10 years of age, that she was entitled to recover
damages for loss of her reserve tube *held*, adequate.

2. Torts—Damages—Proximate Cause.

Generally, a tort-feasor is liable for all injuries resulting di-
rectly from his wrongful act, whether foreseeable or not, pro-
vided the damages are the legal and natural consequences of
the wrongful act, and are such as, according to common experi-
ence and the usual course of events, might reasonably have been
anticipated, thereby excluding remote, contingent, or specu-
lative damages.

3. Same—Proximate Cause.

Liability of a tort-feasor for damages where the connection is
not immediate between the injurious act and the consequences
would require that there be such nearness in the order of events
and closeness in the relation of cause and effect that the in-

References for Points in Headnotes

[1] 41 Am Jur, Physicians and Surgeons §§ 111, 132.
[2, 3, 8] 22 Am Jur 2d, Damages §§ 81–84.
[4, 10] 41 Am Jur, Physicians and Surgeons § 132.
[5] 38 Am Jur, Negligence § 67 *et seq.*
[6] 38 Am Jur, Negligence § 57.
[7] 41 Am Jur, Physicians and Surgeons § 125.
[9] 41 Am Jur, Physicians and Surgeons § 133.
[11, 13] 38 Am Jur, Negligence § 4.
[12] 38 Am Jur, Negligence §§ 58, 67 *et seq.*
[14] 39 Am Jur, New Trial § 24.
  Separate trial of issues of liability and damages in tort.  85 ALR2d
  9.

fluence of the injurious act would predominate over that of other causes and concur to produce the consequences or be traceable to those causes.

4. PHYSICIANS AND SURGEONS—MALPRACTICE—REQUEST TO CHARGE—UNAUTHORIZED SALPINGECTOMY AND OVARIECTOMY—STERILITY—REMOTE CONSEQUENCES.

Denial of requests to charge in malpractice action bearing upon plaintiff's claim for damages for loss of ability to bear children and consequent emotional suffering by reason of defendant surgeon's unauthorized removal of plaintiff's right fallopian tube and ovary when he performed an appendectomy when she was 10 years old *held*, proper in action brought after discovery of such act some 19 years later, since sterility was not a legal and natural consequence of his act but was contingent upon the possibility that she *could* develop a cyst in her remaining tube which cyst *could* require excision of the tube.

SEPARATE OPINION.

SOURIS, J.

5. NEGLIGENCE—PROXIMATE CAUSE—FORESEEABILITY OF INTERVENING ACT.

*Defendant's negligent act is a proximate cause of plaintiff's injury for which liability may be imposed, where, although his act did not directly cause the injury, it subjected plaintiff to an increased exposure to the risk of occurrence of another event which did occur and which did cause plaintiff's injury and it appears defendant should have foreseen some such injury might have been caused by his negligent act.*

6. SAME—PROXIMATE CAUSE—PROBABLE CONSEQUENCES—INCREASED RISK OF EXPOSURE TO INTERVENING ACT.

Probable, *as the term has been used in stating rules of proximate causation to be applied for the imposition of liability for the* probable *consequences of a defendant's negligence, does not necessarily mean* more likely than not, *but rather that there is increased exposure to the risk of occurrence of another event which might cause some injury.*

7. PHYSICIANS AND SURGEONS—UNAUTHORIZED EXCISION OF ONE FALLOPIAN TUBE—PROXIMATE CAUSE—INTERVENING ACT.

*Negligence of defendant surgeon who, in removing plaintiff's appendix when she was 10 years old, also excised her right fallopian tube, did not entitle plaintiff to damages for sterility following removal by another doctor of the left fallopian tube*

*because of a parovarian cyst thereon some 19 years later, where plaintiff failed to establish a causal connection between defendant's negligence and the intervening event, in that defendant's negligence in excising right fallopian tube did not subject plaintiff to an increased exposure to the risk that her left fallopian tube would have to be excised for any reason.*

8. DAMAGES—UNAUTHORIZED EXCISION OF ONE FALLOPIAN TUBE.

*Defendant surgeon may be held liable in damages for wrongful excision of plaintiff's right fallopian tube which excision deprived her of her fertility reserve provided by nature.*

9. SAME—UNAUTHORIZED EXCISION OF ONE FALLOPIAN TUBE—DIFFICULTY IN ASSESSMENT.

*Difficulty in assessing damages for wrongful excision of reserve fallopian tube will not preclude recovery, since the case is one which affords no elements of certainty by which the loss actually suffered can be shown with accuracy.*

DISSENTING OPINION.

ADAMS, J.

10. PHYSICIANS AND SURGEONS—SALPINGECTOMY—OVARIECTOMY—LOSS OF FERTILITY—QUESTION FOR JURY.

*Whether loss of fertility plaintiff sustained by reason of defendant osteopath's unauthorized removal of her right fallopian tube and ovary when performing appendectomy when she was 10 years old should be a responsibility of defendant even though there was an intervening cause some 19 years later* held, *a question for the jury, where plaintiff's harm through such loss of fertility can be traced, in fact, to defendant, and jury might find him liable for the foreseeable consequences of his act.*

11. NEGLIGENCE—LIABILITY FOR TORTS.

*The extent of a tort-feasor's responsibility for his wrongful act must usually be determined on a case-to-case basis.*

12. SAME—FORESEEABILITY—INTERVENING ACT.

*The essential factor in determining liability for a negligent act is whether the damage is of such a kind as a reasonable man should have foreseen, even where there is an intervening act.*

13. SAME—LIABILITY FOR WRONGDOING.

*Liability for negligence is based upon a general public sentiment of moral wrongdoing for which the offender must pay.*

14. NEW TRIAL—LIMITED NEW TRIAL—LIABILITY—DAMAGES.

> *Full new trial is granted, rather than a new trial limited to issue*
> *of damages, where issues of liability and damages are so bound*
> *up in one another that in fairness to both parties there ought*
> *not to be a severance of the damages or consideration of it*
> *alone.*

Appeal from Wayne; Fitzgerald (Neal), J. Submitted February 4, 1965. (Docket No. 43, Calendar No. 50,400.)  Decided February 8, 1966.

Declaration by Rita Sutter against Raymond A. Biggs for unauthorized removal of right fallopian tube and fraudulent concealment, sterility being discovered subsequently upon necessary removal of left fallopian tube.  Verdict and judgment for plaintiff. Plaintiff appeals, claiming inadequate award of damages.  Affirmed.

*Kelman, Loria, Downing & Craig (Sheldon Otis* and *George L. Downing,* of counsel), for plaintiff.

*Ward, Plunkett, Cooney, Rutt & Peacock (Robert E. Plunkett* and *Charles T. McGorisk,* of counsel), for defendant.

SMITH, J.  In this action for medical malpractice, plaintiff appeals from a $7,500 judgment rendered in her favor, claiming that the jury was precluded by the trial judge from considering her full measure of damages.  She seeks a new trial as to damages only.

In 1940, when plaintiff was a 10-year-old girl defendant doctor removed her appendix.  It was claimed by plaintiff, but denied by defendant, that at the same time defendant also removed her right

fallopian tube and ovary without parental authority or consent. In 1959, when plaintiff had to be operated on by another doctor for removal of a cyst on her left fallopian tube, it was then first discovered that her right fallopian tube and ovary were missing. The only other surgery she had between 1940 and 1959 was a tonsillectomy. Claiming fraudulent concealment of 1940 facts constituting her cause of action, plaintiff filed this suit February 19, 1960. Plaintiff sought damages not only for the alleged 1940 loss of her right ovary and fallopian tube, but also for loss of ability to bear children occasioned by her 1959 surgery in which her left, or remaining, tube was removed. She also claimed damages for "emotional pain and suffering resulting therefrom."

Medical testimony was offered to show basic functions of female reproductive organs which are the subject of this lawsuit. Each female is born with (except in rarest instances) 2 tubes and 2 ovaries, identified by position in the pelvic region as either left or right. In the mature female, these fallopian tubes conduct ova from the ovaries to the uterine tube where it may be fertilized. Testimony was presented to show that a woman with only 1 ovary is just as fertile as a woman with both ovaries, provided she has both fallopian tubes. If 1 tube and ovary are removed, a woman is said to be "almost as fertile" as one who has tubes and ovaries on both sides. But a woman, like plaintiff, who has 1 ovary but no fallopian tube cannot become pregnant with child.

In support of plaintiff's theory that her inability to bear children after the 1959 surgery was a "direct and proximate result" of defendant's 1940 act, plaintiff adduced the following medical testimony of somewhat dubious value:

"*Q.* All right. It is then known to you that people do—*women do develop parovarian cysts during their lifetime?*

"*A.* It happens.

"*Q.* And it *happens frequently enough* so that there is *considerable surgery of that nature in the removal of cysts.* Is that not right?

"*A.* That is correct.

"*Q.* It would be something that any osteopathic surgeon should be aware of. Is that not correct?

"*A.* Any physician should.

"*Q.* Any physician should be aware that this is *likely* to occur, that is *possible* to occur?

"*A. Huh huh.*"     (Emphasis supplied.)

Plaintiff says this testimony shows that "Rita Sutter [plaintiff], like any woman, *could* develop a cyst requiring surgery. *If* the cyst encroaches upon a fallopian tube, the tube's blood supply *can* be severed thereby killing the tube. When Dr. Biggs wrongfully excised Rita Sutter's right fallopian tube, he created a risk known to him as an osteopathic physician, that Rita Sutter *could* be rendered incapable of bearing children." (Emphasis supplied.)

The trial court, however, refused plaintiff's requests for instructions bearing upon plaintiff's claim for damages for loss of ability to bear children and consequent emotional suffering. Also, plaintiff's counsel was not permitted to argue this damage claim to the jury. The court did instruct the jury that plaintiff was entitled to recover damages for loss of her reserve tube. That part of its instruction was basically adequate, is not properly in issue here, and hence need not be discussed.

The trial court instructed the jury as follows:

"I am going to instruct you right now that the fact that this woman is unable to bear children is not a proximate result of any negligence that you

might find this defendant was guilty of.  *  *  *
After he did this act this woman was very capable
of bearing children.  All of the testimony in this
case says so."

The trial court then explained in essence that the
second operation in which plaintiff's left, or remain-
ing, tube was removed was the intervening cause,
concluding on this point that "In the opinion of this
court it is not a foreseeable consequence that this
woman was as a result of losing one ovary, which
left her with another one which was perfectly capa-
ble of enabling her to have children—that 20 years
later, or some 19 years later, she should suffer some
kind of an interference that would deprive her of
that power." In its essential reasoning, the instruc-
tion is correct.

The general rule, expressed in terms of damages,
and long followed in this State, is that in a tort
action, the tort-feasor is liable for all injuries re-
sulting directly from his wrongful act, whether
foreseeable or not, provided the damages are the
legal and natural consequences of the wrongful act,
and are such as, according to common experience
and the usual course of events, might reasonably
have been anticipated. Remote, contingent, or spec-
ulative damages are not considered in conformity
to the general rule. *Van Keulen & Winchester
Lumber Co.* v. *Manistee & Northeastern Railroad
Co.,* 222 Mich 682; *Woodyard* v. *Barnett,* 335 Mich
352; and *Fisk* v. *Powell,* 349 Mich 604. See, also,
*McLane, Swift & Co.* v. *Botsford Elevator Co.,* 136
Mich 664; and *Cassidy* v. *Kraft-Phenix Cheese
Corp.,* 285 Mich 426.

Further, to render a wrongdoer liable in damages
in a tort action where the connection is not immedi-
ate between the injurious act and the consequences,
such nearness in the order of events and closeness

in the relation of cause and effect must subsist, so
that the influence of the injurious act would pre-
dominate over that of other causes, and concur to
produce the consequences or be traceable to those
causes. *Woodyard* v. *Barnett, supra.*

Under facts adduced in this case, it is too tenuous
a proposition to say that the element of damages
in dispute, inability to bear children, et cetera, is
a legal and natural consequence of defendant's
wrongful act. At best, the damages are contingent
and, therefore, barred under the general rule above
recited. The testimony showed, as plaintiff's sum-
mary indicates, that, having already lost her re-
serve tube,[*] it was thought possible that plaintiff,
like any other woman, *could* develop a cyst upon
the remaining tube which *could* require surgery,
that is, if the cyst were gross enough to encroach
seriously upon the blood supply. The testimony
also showed that cysts are frequently treated suc-
cessfully without the necessity of total excision of
the tube. In the case before us, therefore, plaintiff's
loss of ability to bear children was not a legal and
natural consequence of defendant's act, but, within
the meaning of the rule, was contingent, that is,
contingent upon the possibility that plaintiff *could*
develop a cyst on her remaining tube which *could*
require excision of the tube itself.

Affirmed. Costs to appellee.

DETHMERS, KELLY, and O'HARA, JJ., concurred
with SMITH, J.

SOURIS, J. (*concurring*). Michigan cases which
have considered the question whether a defendant's
act is to be deemed a proximate cause of a plain-

---

[*] See *Dunn* v. *Easley* (1963), 42 Ala App 51 (151 So 2d 791); *Lo-
pez* v. *Price* (1958), 145 Conn 560 (145 A2d 127); and *Rivers* v.
*Leitman* (CA 4, 1963), 317 F2d 102.

tiff's injury have given only abstract, and often varying, guidelines as to when a fact finder legitimately may determine that a negligent act in a chain of acts leading to plaintiff's injury is a proximate, that is, a liability-predicating, cause. Considering those decisions which have given the widest scope to the concept of proximate cause, the rule in Michigan, in its most liberal form, may be stated thusly:

*If defendant's negligent act did not directly cause the injury for which plaintiff seeks recovery but, instead, it subjected plaintiff to an increased exposure to the risk of occurrence of another event which did occur and did cause plaintiff's injury, then defendant's negligent act is a proximate cause of the injury and defendant may be held liable therefor if defendant should have foreseen that some such injury might be caused by such other event.*[1]

Such a formulation provides a consistent rationale for a variety of cases in which there are one or more intervening events between defendant's negligent act and the particular injury for which plaintiff is seeking recovery. Thus it explains *Patterson* v. *Detroit, L. & N. R. Co.* (1885), 56 Mich 172, where

---

[1] *Cf.* Payne, Foresight and Remoteness of Damage in Negligence, 25 Mod L Rev 1, 12 (1962):

"Ulterior harm is a convenient term to describe harm caused or aggravated by some contingency which occurs after the event which the defendant ought to have foreseen and guarded against and which [contingency] is causally independent of that event. * * * The principle running through the cases seems to be that a defendant is liable for ulterior harm only if the wrongful state of affairs brought about by his negligence exposes the plaintiff to a special risk of injury from the sort of contingency which causes the ulterior harm. The common sense notion underlying this rule is that of causal potency; the defendant's negligence renders the plaintiff specially vulnerable to harm from the sort of contingency which occurs and therefore is the cause of it."

And see *Tozer* v. *Michigan C. R. Co.* (1917), 195 Mich 662, 666, and *Baker* v. *Michigan C. R. Co.* (1912), 169 Mich 609, 618, 619, as quoted in *LaPointe* v. *Chevrette* (1933), 264 Mich 482, 491.

plaintiff, whose passage was blocked by defendant's train across the highway, was permitted to recover damages resulting from his having missed another train because of the delay. It explains why a defendant who negligently injures plaintiff is also liable for further injuries done to plaintiff by the malpractice of a seemingly competent physician engaged to treat the injury. See *Reed* v. *City of Detroit* (1896), 108 Mich 224. It explains the basis for liability of a negligent defendant for the aggravation of plaintiff's injury by a subsequent accident to plaintiff, as when a plaintiff with an injured leg slips and falls, increasing the injury to the leg. See *Stahl* v. *Southern M. R. Co.* (1920), 211 Mich 350. It explains why a defendant who, in the course of a vehicular accident, negligently exposes plaintiff to the risk of being struck by other vehicles, is liable to plaintiff for injuries incurred when plaintiff is so struck. See *Bordner* v. *McKernan* (1940), 294 Mich 411; *Maddux* v. *Donaldson* (1961), 362 Mich 425.

Most of our cases which consider the issue of proximate cause say that for it to be found, the injury complained of must have been a "probable" consequence of defendant's negligent act. If "probable" means, as it undoubtedly does, "more likely than not",[2] then many of the cases in which such language is used themselves give it the lie. Did this Court really mean to say in *Reed, supra,* that if one goes to a physician for treatment of an injury, it is more likely than not that he will receive negligent medical treatment? If this were true, no one would consult a physician unless he were convinced that he had virtually no hope of recovery anyway. Nor does it comport with common knowl-

---

[2] See, *e.g., Price* v. *Neyland* (1963), 115 DC App 355, 359 (320 F2d 674, 678).

edge to believe, as the Court in *Stahl, supra,* apparently would have us believe, that it is more likely than not that one who is injured in an accident will have his injury aggravated by a subsequent accident. Because of this discrepancy between what the cases say, and, in the light of their facts, what they rationally must be held to have meant, language of *probability* has been eschewed in the general formulation, *supra,* and instead there has been employed language of increased exposure to the risk of occurrence of another event which might cause some injury. This latter language, in my view, correctly reflects the meaning of those cases in which words of probability have been employed injudiciously in defining proximate cause where defendant's negligent act alone is not the direct cause of plaintiff's injury.

It is against this background of the law as I consider it to be in Michigan that we must view the facts of this case of Sutter. A jury has found that defendant Biggs, a doctor, was guilty of actionable negligence in excising plaintiff's right fallopian tube and ovary[3] during an appendectomy in 1940, without having had authority to operate upon plaintiff's reproductive organs and having thereafter fraudulently concealed such excision until it was discovered in 1959 during the course of surgical removal by another doctor of plaintiff's left fallopian tube made necessary because of a parovarian cyst thereon. The jury, as it was permitted to do by the trial judge's instructions, returned a verdict for plaintiff in the amount of $7,500. While the trial judge's instructions allowed the jury to award damages for defendant's removal of plaintiff's right fallopian tube, referred to as her "reserve" fal-

---

[3] In the balance of this opinion I shall refer only to the fallopian tube.

lopian tube, the jury was instructed it could not award damages against defendant for plaintiff's subsequent barrenness because such subsequent barrenness was not proximately caused by defendant's act. We are asked by plaintiff to vacate the judgment below and to remand for new trial on the issue of damages alone, her theory being that the trial judge erred in barring the jury from awarding her damages against defendant for her present barrenness.

As I view the record facts and our law, plaintiff's claim is not encompassed within even the broad scope of the decisions discussed above, the holdings of which are summarized in the formulation of our concept of proximate cause set forth in the forepart of this opinion. There is nothing in the record before us upon which to base a finding that Dr. Biggs' negligence in excising plaintiff's right fallopian tube subjected plaintiff to an increased exposure to the risk that her left fallopian tube would have to be excised for any reason. Thus plaintiff failed to establish a causal connection between defendant's negligence and the event, excision of her left fallopian tube, which rendered plaintiff barren.

On the record made in this case, for plaintiff to prevail in her attempt to recover damages from defendant for her barrenness, we would have to hold that because defendant's negligence may have exposed plaintiff to an increased risk of barrenness, in that she no longer had a right fallopian tube to rely upon as a reserve in the event she subsequently lost her left tube, when barrenness actually did eventuate, defendant was liable therefor even though his negligence was in no way causally related to the ultimate event, loss of the remaining tube, which produced barrenness. Such a holding would carry us far beyond any Michigan case I have found, and probably would have a profoundly un-

settling effect upon our law of negligence. For example, if that were to be the law, one could then argue that a plaintiff who has lost one leg as a result of a defendant's negligence has been exposed to an increased risk of complete ambulatory immobility upon the loss of the other leg; and if he should lose that other leg a year later, or, as in Sutter, 19 years later, in an automobile accident while a guest passenger, or as the result of sickness, or in any other manner not connected with defendant's negligent act, would not the defendant be held liable in damages for plaintiff's resultant immobility? Such a result would be logically imperative if plaintiff's theory of recovery in the case at bar were adopted by this Court.

The extent to which a defendant properly should be liable for his negligence is a troublesome problem which merits further attention by judges and by scholars. While I am not entirely satisfied that a defendant whose negligence exposes his victim to increased risk of future injury upon the occurrence of an event independent of defendant's negligence should escape liability for such future injuries when they in fact occur, I am not yet persuaded that it would be consistent with sound policy and conducive to just results to sanction the enormously expanded vistas of liability which would be opened if plaintiff Sutter's theories were accepted.

Although plaintiff cannot, on the record made in this case, recover damages for her barrenness, I agree with my Brother Smith that she was entitled to recover damages for the loss of a "reserve" fallopian tube. The evidence presented clearly established that the female reproductive system is provided with two fallopian tubes and that, if one is lost, fertility is maintained unimpaired by the functioning of the other. As long as a woman has both

tubes, damage to one tube will not render her barren.

By wrongfully excising Miss Sutter's right fallopian tube, defendant deprived her of her fertility reserve provided by nature. For this, he may be held liable in damages. The situation is, of course, unusual, simply because there are not many instances in which the body is provided with two means of performing the same function, either of which will completely fulfill that function in the absence of the other. A situation somewhat analogous to the loss of one fallopian tube is the loss of one eye, and in such a case the language used by some courts indicates that the jury, in determining damages, may consider the fact that plaintiff has been deprived of a reserve eye.[4]

The amount of damages to award for the loss of the reserve against barrenness, provided by the possession of two fallopian tubes, is, of course, difficult to assess. Such difficulty, however, is not enough to preclude plaintiff from recovery.

"The injured party has consented to enter into no relation with the wrong-doer by which any hazard of loss should be incurred; nor has he received any consideration, or chance of benefit or advantage, for the assumption of such hazard; nor has the wrong-doer given any consideration, nor assumed any risk, in consequence of any act or consent of his. The injured party has had no opportunity to protect himself by contract against any uncertainty in the estimate of damages; no act of his has contributed to the injury; he has yielded nothing by consent; and, least of all, has he consented that the

---

[4] See *Lopez* v. *Price* (1958), 145 Conn 560 (145 A2d 127); *Dunn* v. *Easley* (1963), 42 Ala App 51 (151 So 2d 791); *Rivers* v. *Leitman* (CA 4, 1963), 317 F2d 102. The situation is not precisely analogous, since some aspects of vision, *e.g.*, depth perception and peripheral vision, are impaired when one has only one eye, while this record discloses that a woman with but one fallopian tube is as fertile as a woman with two.

wrong-doer might take or injure his property or deprive him of his rights, for such sum as, by the strict rules which the law has established for the measurement of damages in actions upon contract. he may be able to show, with certainty, he has sustained by such taking or injury. *Especially would it be unjust to presume such consent, and to hold him to the recovery of such damages only as may be measured with certainty by fixed and definite rules, when the case is one which, from its very nature, affords no elements of certainty by which the loss he has actually suffered can be shown with accuracy by any evidence of which the case is susceptible.* [Emphasis added.] Is he to blame because the case happens to be one of this character? He has had no choice, no selection. The nature of the case is such that the wrong-doer has chosen to make it; and upon every principle of justice, *he* is the party who should be made to sustain all the risk of loss which may arise from the uncertainty pertaining to the nature of the case, and the difficulty of accurately estimating the results of his own wrongful act. Upon what principle of right can courts of justice assume—not simply to divide this risk, which would be thus far unjust—but to relieve the wrong-doer from it entirely, and throw the *whole* upon the innocent and injured party? Must not such a course of decision tend to encourage trespasses? * * *

"The law does not require impossibilities; and cannot, therefore, require a higher degree of certainty than the nature of the case admits. And we can see no good reason for requiring any higher degree of certainty in respect to the amount of damages, than in respect to any other branch of the cause. Juries are allowed to act upon probable and inferential, as well as direct and positive, proof. And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the

facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit. This should, of course be done with such instructions and advice from the court as the circumstances of the case may require, and as may tend to prevent the allowance of such as may be merely possible, or too remote or fanciful in their character to be safely considered as the result of the injury.

"In the adoption of this course it will seldom happen that the court, hearing the evidence, will not thereby possess the means of forming a satisfactory judgment whether the damages are unreasonable, or exorbitant; and, if satisfied they are so, the court have always the power to set aside the verdict and grant a new trial." *Allison* v. *Chandler* (1863), 11 Mich 542, 553–556.

In this case, the trial judge's charge adequately instructed the jury that it could award plaintiff damages for the loss of a reserve tube, of which loss defendant's negligence was the undoubted cause, but that it could not award damages for plaintiff's barrenness, which defendant did not proximately cause. Under the law as it now exists, plaintiff was entitled to no more.

Affirmed. Costs to defendant.

ADAMS, J. (*dissenting*). Plaintiff prevailed in her claim that the defendant wrongfully removed her right fallopian tube in 1940 when she was 10 years of age. She also prevailed in her claim that defendant fraudulently concealed his action until it was discovered in 1959. Had there been no fraudulent concealment, plaintiff's claim would have accrued long before it did. Upon such accrual, her damages would have been the loss of a reserve tube.

In this case, however, there is no need for a jury to envision plaintiff's damages resulting from such a loss. The ultimate consequence had already occurred.

This consequence of defendant's act was foreseeable. Dr. Biggs testified:

"*Q.* Now, Doctor, have you had any experience with so-called ovarian cysts in your surgical experience?

"*A.* Yes, I have.

"*Q.* Have you seen them?

"*A.* Many times.

"*Q.* How frequently would you say, Doctor?

"*A.* Well, a simple cyst, it is not seen every day, but they are quite common. Cysts of the ovary are very common. And cysts such as tubal ovarian cysts, they are seen right along. I mean, the percentage is not high, but we see them. I would say in female surgery which is probably—g-y-n surgery —years ago was more than it is now; but I would say at one time ran as high as probably 70 percent. However, now it is down. I would say it is considerably down. I would say probably it is 25 or 30 percent.

"*Q.* Have you had experience with so-called parovarian cysts yourself?

"*A.* Yes, I have, on many occasions.

"*Q.* Have you ever seen one as large as a so-called orange?

"*A.* Oh, yes, much larger."

The testimony of Dr. Adler, under cross-examination by plaintiff's attorney, was as follows:

"*Q.* All right. And, if the wall of the fallopian tube has grown right into the wall of the cyst it is entirely possible in removing the cyst to interfere with the blood supply to the fallopian tube. Is it not?

"*A.* Only if the cyst was large enough to encroach into the wall of the fallopian tube.

"*Q.* Well, a large size cyst is large enough to do that too?

"*A.* Not necessarily.

"*Q.* But it is large enough to do that; is it not? I am not saying in every case now. I am saying, is it not possible that an orange-size cyst would be large enough to encroach on the wall of the fallopian tube?

"*A.* And I will have to answer that it would depend on the size of that cyst.

"*Q.* We already said, orange-size, 2–1/2 to 2–3/4 inches?

"*A.* That would not necessarily encroach on the wall of the fallopian tube.

"*Q.* The question is not whether it would necessarily do so. The question is whether it can do so?

"*A.* I suppose it could.

"*Q.* All right. And whether or not in removing a parovarian cyst the fallopian tube to which it is appended is destroyed depends upon whether there is an interference to the blood supply. Is that not right?

"*A.* You will have to give me that question again?

"*Q.* Well, if there is an interference to the blood supply in the removal of the cyst, so that the tube has no blood supply, then that tube cannot survive; can it?

"*The Witness:* Your Honor, I don't think there is any relationship to the blood supply of the tube and the parovarian cyst.

"*The Court:* All you have to do is say that.

"*Q. (By Mr. Downing):* If the blood supply to the fallopian tube is interrupted, the fallopian tube cannot survive?

"*A.* If the blood supply is interrupted, it can't survive.

"*Q.* All right. It is then known to you that people do—women do develop parovarian cysts during their lifetime?

"*A.* It happens.

"*Q.* And it happens frequently enough so that there is considerable surgery of that nature in the removal of cysts. Is that not right?

"*A.* That is correct.

"*Q.* It would be something that any osteopathic surgeon should be aware of. Is that not correct?

"*A.* Any physician should.

"*Q.* Any physician should be aware that this is likely to occur, that this is possible to occur?

"*A.* Huh huh."

From this and other testimony, had it been properly charged by the trial judge, the jury could have found that defendant was responsible for plaintiff's loss of fertility even though there was an intervening cause.

The extent of a defendant's responsibility for the consequences of a wrongful act must usually be determined on a case-to-case basis. There are no Michigan cases such as this one, but some Michigan cases are analogous.

In *Parks* v. *Starks,* 342 Mich 443, where defendant struck a pillar with his car, rendering the canopy it supported unsafe, there was a time interval between his act of negligence and the time when plaintiff was injured as a result of collapse of the structure. There was also an intervening cause— children who had gone under the canopy and who plaintiff believed to be in danger. The presence of the children precipitated plaintiff's effort to rescue them which ended in his injury.

In the case of *Stahl* v. *Southern Michigan R. Co.,* 211 Mich 350, after plaintiff was injured as the result of negligence of the operator of an interurban car, her injuries were aggravated because of an improper diagnosis by a physician. The physician failed to uncover a hip fracture. While packing

a suit case, plaintiff fell on the injured hip. The Court said (p 355):

"If the suit case injury was the result of the injuries she received in the railway accident, and her own negligence did not contribute to it, she would be entitled to recover all of her damages against the defendant in this action. This rule is well stated in the recent case of *Smith* v. *Railway Co.*, 79 Wash 448 (140 P 685), where it is said:

" 'If a person receives an injury through the negligent act of another, and the injury is afterwards aggravated, and a recovery retarded through some accident not the result of want of ordinary care on the part of the injured person, he may recover for the entire injury sustained, as the law regards the probability of such aggravation as a consequent and natural result likely to follow from the original injury.' "

In the above case there was an intervening cause —the doctor's faulty diagnosis—but nevertheless defendant was held liable for the full extent of plaintiff's injuries.

In the case of *Bordner* v. *McKernan*, 294 Mich 411, where plaintiff's injuries resulted because he was left in a stalled taxicab at night in the middle of the street, it was held that defendant, having put plaintiff in his predicament, must stand for the damages which occurred as a result of the act of a third person.

An English case, *Overseas Tankship, Ltd.*, v. *Morts Dock & Engineering Co., Ltd.*, [1961] AC 388, [1961] 1 All Eng 404 (100 ALR2d 928), lends clarity to the importance of foreseeability in the law of negligence. In that case appellants allowed furnace oil to escape and spread upon the water. A fire was caused when a spark fell from a dock onto waste in the water, igniting the waste and thereby touching off the fuel oil. The trial judge stated:

"The *raison d'etre* of furnace oil is, of course, that it shall burn, but I find the defendant [appellants] did not know *and could not reasonably be expected to have known* that it was capable of being set afire when spread on water." (Emphasis supplied.)

Upon appeal to the privy council, the problem was analyzed by Viscount Simonds as follows:

"The essential factor in determining liability is whether the damage is of such a kind as the reasonable man should have foreseen. This accords with the general view thus stated by Lord Atkin in *M'Alister (or Donoghue) v. Stevenson:*[1]

" 'The liability for negligence, whether you style it such or treat it as in other systems as a species of "culpa," is no doubt based upon a general public sentiment of moral wrongdoing for which the offender must pay.'

"It is a departure from this sovereign principle if liability is made to depend solely on the damage being the 'direct' or 'natural' consequence of the precedent act. Who knows or can be assumed to know all the processes of nature? *But if it would be wrong that a man should be held liable for damage unpredictable by a reasonable man because it was 'direct' or 'natural' equally it would be wrong that he should escape liability, however 'indirect' the damage, if he foresaw or could reasonably foresee the intervening events which led to its being done;* cf. *Woods v. Duncan.*"[2] (Emphasis supplied.)

Plaintiff would not have been rendered sterile but for the loss of the second fallopian tube. The loss of the second fallopian tube would not have rendered her sterile but for the wrongful removal of the first one. Since plaintiff's harm can be traced

---

[1] [1932] AC 562, 580.
[2] [1946] AC 401.

in fact to defendant, a jury might find defendant liable for the foreseeable consequences of his act.

Dr. Biggs and Dr. Adler testified with regard to the frequency of operations for ovarian cysts and their potential for danger. We cannot say that there is no room for disagreement among reasonable men that the intervening event was not foreseeable. Consequently, I hold that it was a question for the jury to decide whether defendant, an osteopathic physician, could reasonably have foreseen that his removal of plaintiff's right fallopian tube, due to possibility of loss of the left tube, might result in plaintiff being rendered sterile.

I do not agree with Justice SOURIS that, by permitting such a question to go to the jury, we would be opening the door to the sort of claim he hypothesizes for loss of a second leg. People walk on two legs. The loss of one is a grievous injury. The testimony in this case was that women can bear children (remain fully functional in this respect) with one fallopian tube. Hence, the loss of but one fallopian tube is of little consequence.

In this respect, I would liken the loss of a fallopian tube to the loss of a kidney. A human being can survive with one kidney. If a physician wrongfully removes one kidney, is the injured person to be restricted to minimal damages or is recovery by his estate to be so restricted in event of his death because the second kidney was lost from some other cause?

I would reverse and remand, granting a full new trial rather than simply a new trial on the issue of damages. In *Bias* v. *Ausbury,* 369 Mich 378, this Court reversed and granted a new trial limited to the question of damages. However, in this case the issues are so bound up in one another that in fairness to both parties there ought not to be a sever-

ance of the damage issue or consideration of it alone.

Plaintiff should have costs.

BLACK, J., concurred in result.

T. M. KAVANAGH, C. J., did not sit.