PETER BILL & ASSOCIATES, INC v DEPARTMENT OF NATURAL RESOURCES

Docket No. 78-3023. Submitted June 5, 1979, at Lansing.—Decided November 19, 1979.

Peter Bill and Associates, Inc., through its president and sole stockholder Peter Bill, undertook to salvage a cargo of steel from a vessel submerged in Lake Huron. Bill obtained a non-objection permit from the Department of Natural Resources and the necessary permits from the Federal authorities and proceeded to contract with various persons and firms for the equipment and services necessary to accomplish the salvage operation. The project was fraught with misfortune and delay; however, at one point about 100 tons of steel, of the approximately 5,000 tons aboard the vessel, were recovered and sold. Bill was then informed by the DNR that his permit was revoked, and Bill's attempts to mobilize a new diving crew were temporarily halted. About two weeks later Bill was notified by the DNR's representative that the revocation of his permit had been based on an erroneous interpretation of an Attorney General's opinion and that the DNR was again changing its position and that Bill could proceed with the salvage operation. Bill alleged that by this time his funds were exhausted. The project was abandoned with no more steel being recovered. Bill brought an action in the Court of Claims against the DNR, alleging that the acts of the DNR caused abandonment of the project and constituted tortious interference with the plaintiff's contractual rights and economic expectancies. The Court of Claims, George R. Deneweth, J., found that the DNR was liable for tortious interference with an economic expectancy, and entered a judgment for plaintiff. The defendant appeals, alleging that the DNR is protected from liability by governmental immunity, that the evidence does not support a finding of tortious interference with plaintiff's contractual rights or economic expectancies, and that the trial court erred in awarding as damages the value of the steel remaining on the sunken vessel. *Held:*

1. The DNR's action was not a "governmental function" for

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 42.

[2] 45 Am Jur 2d, Interference § 110.

[3] 74 Am Jur 2d, Torts § 7.

purposes of governmental immunity from tort liability. In protecting its property rights the state's acts are no different than those of private property owners. The DNR is not protected by sovereign immunity in this matter.

2. The trial court's finding of a tortious interference with an economic expectancy is not clearly erroneous, and is supported by the evidence.

3. The trial court properly used the value of the remaining steel as the basic measure of damages. However, the court erred in disregarding the cost of completing the salvage operation. The case is a proper one for *remittitur* of an amount representing the completion costs.

Remanded.

1. ADMINISTRATIVE LAW — TORTS — GOVERNMENTAL IMMUNITY — SALVAGE.

The determination of the Department of Natural Resources to approve or disapprove the salvaging of materials located on the state's land is not a governmental function for the purpose of governmental immunity from tort liability; the protection of the state's property is not "of essence to governing", rather, the state's acts in protecting its property rights are no different than those of private property owners.

2. TORTS — INTERFERENCE WITH ECONOMIC EXPECTANCY.

The existence or knowledge of a contract is not required in order for a defendant to be found liable for tortious interference with an economic expectancy.

3. TORTS — DAMAGES — MEASURE OF DAMAGES.

A tortfeasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated.

*Lowell Blumberg,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Frank J. Pipp* and *Curtis G. Beck,* Assistants Attorney General, for defendant.

Before: Danhof, C.J., and V. J. Brennan and
H. R. Carroll,* JJ.

Danhof, C.J. This case marks this Court's sec-
ond encounter with the nautical saga of plaintiff's
efforts to salvage the cargo of a ship which has
lain at the bottom of Lake Huron for nearly 20
years. See *Light v Schmidt,* 84 Mich App 51; 269
NW2d 304 (1978). In this latest chapter, the Court
of Claims, Macomb County Circuit Judge George
R. Deneweth presiding, entered judgment against
the Michigan Department of Natural Resources
for $494,000 purportedly lost by plaintiff because
certain actions of defendant caused the failure of
his salvage operation. The defendant department
appeals as of right.

In 1959 the S.S. Monrovia, a freighter of Libe-
rian registry, collided with another vessel and
sank in Lake Huron in 27 fathoms of water, about
13.6 miles east of the Thunder Bay Light. The
ship's manifest showed that it carried approxi-
mately 5,000 tons of German and Belgian struc-
tural steel.

Peter Bill performed investigative work for the
lawyer who handled the crew's personal injury
cases. At that time he decided to salvage the steel.

In 1972, Bill embarked on a program of obtain-
ing the necessary permits and financing. He
learned that the cargo was abandoned to the
United States Army Corps of Engineers. Bill ob-
tained a non-objection permit from the Corps which
indicated he should also clear the project with the
Coast Guard and any applicable state agency. Bill
subsequently contacted the Coast Guard.

On April 18, 1974, he obtained a non-objection

---

* Former circuit judge, sitting on the Court of Appeals by assign-
ment pursuant to Const 1963, art 6, § 23 as amended in 1968.

letter from George Bruso, a law enforcement officer for defendant DNR.

On May 15, 1974, Bill leased the tug "Lobo" (then docked in Lorain, Ohio) for $20,000 per month.

On May 17, 1974, he contracted to sell the steel raised to ABC Steel Sales, Inc., of Detroit. ABC agreed to purchase approximately 2700 tons of prime steel at 9.5 cents per pound ($190 per ton), and additional sub-par steel at the rate of 6.5 cents per pound ($130 per ton). After receiving evidence that Bill had invested $40,000 of his personal savings into the project, ABC advanced him $75,-000 to be repaid within 90 days. This advance was secured by a second mortgage on Bill's personal residence. Under the contract, ABC agreed to pick up the steel on a dock in Alpena and pay for it within 48 hours. ABC was authorized to deduct $30 per ton to be applied to the advance.

On May 18, 1974, Bill contracted with Donald C. Schmidt d/b/a Michigan Marine Salvage and Assistance for Schmidt to provide no less than six divers, a topside crew, equipment, and the supervision required for the salvage (exclusive of the barge, tug and tug-crew which Bill would provide) at Schmidt's expense. Schmidt was to exert best efforts to complete the operation within 30 days of the first cargo lift. Bill agreed to pay $5,000 in advance and $21,750 for each 500 tons of steel delivered to the shore (up to a maximum of $145,-000). Schmidt hired Russell F. Light, a veteran diver with a diving crew, to perform the underwater work.

An initial effort to locate the Monrovia on May 18, 1974, was unsuccessful. On May 27, 1974, the S.S. Monrovia was located. However, once on the site, a dispute erupted between Bill's crew and

another salvor, one Massey. George Bruso testified that Bill complained to him that Massey was circling Bill's ship with guns and explosives and making threats.

Inspection dives were made on May 27, June 1 and June 2, 1974. Bill testified that Light reported the steel was beautiful and stacked on cribbing. Light testified that the steel was beautiful but not stacked on cribbing. Light also stated that hold No. 5 contained ten feet of bunker C oil while the tug board captain testified that the diver had oil marks only to the thigh level.

Although the barge and crane needed to lift the steel arrived at the project site about June 2, 1974, rough weather prevented salvage operations from proceeding until about June 12 or 13.

At about this time, the diving crew began complaining that they were not being paid. Peter Bill voluntarily advanced $12,000 to Schmidt for the divers, in an attempt to salvage the operation. However, the divers were still not paid.

Between June 12 and 16, 1974, approximately 100 tons of steel were raised from the Monrovia; 30 to 40 tons were delivered to ABC and the balance sold to an Alpena scrap dealer to meet expenses.

On June 17, 1974, the Lobo ran across Head Reef and was damaged while returning from the Monrovia. Temporary repairs were made by the crew in Rockport.

On June 18, 1974, Russell Light and his divers left the project.

Schmidt then persuaded Peter Bill to allow Schmidt to salvage a brass propeller from the Nordmeer, another wreck lying in the area, to raise money. The damaged Lobo and Schmidt's remaining crew spent two days at the Nordmeer.

Unfortunately, when they returned with the propeller, they discovered that it was cast iron. In addition, Schmidt damaged plaintiff's crane when he cut a steel boom from the Nordmeer.

Upon learning of this accident, the owner of the crane towed the barge, crane, and equipment to Cheboygan and beached it until he was paid. With the help of a prosecutor from Cheboygan, Bill brought the barge back.

Meanwhile, the Lobo proceeded to Detroit for permanent repairs and returned by July 7 or 8, 1974.

On approximately July 15, 1974, a new 85-ton crane, which was considerably more powerful than the damaged crane, arrived on the scene.

Early in July, Bill contacted a Connecticut firm, headed by George W. Wiswell, in order to obtain a new crew of divers. Around July 9, 1979, Wiswell verbally agreed to mobilize a crew. Mobilization involved preparing and making ready equipment and personnel. It could take anywhere from one or two weeks to two months to mobilize. Bill testified that, once mobilized, the divers could be on site within a day and a half and operational within two or three days of arrival. Thus, Bill thought he could have commenced salvage operations by July 20 or 22, 1974.

Peter Bill testified that on or about July 18, 1974, he was approached by a representative of defendant, accompanied by a State Police trooper. According to Bill, defendant's representative told him that approval for his project had been withdrawn and that he would be incarcerated if he attempted to proceed.

In a letter dated July 24, 1974, defendant's employee George Bruso, who had issued the earlier non-objection permit, informed Peter Bill that the

permit was revoked and that the Monrovia and its cargo belonged to the state and its citizens. The letter stated that defendant would let bids for the salvage of the cargo.

Peter Bill testified that, after he received the verbal warning from defendant's agent, he called Wiswell and advised him to hold off on mobilizing divers until the difficulties were resolved.

On August 2, 1974, Edward Giuliano, an attorney representing plaintiff, wrote George Bruso and vehemently objected to the revocation of the salvage permit. Immediately thereafter, Bill contacted Wiswell and instructed him to continue mobilization.

Toward the end of July, Bill borrowed an additional $53,500 from family and friends to meet expenses. He testified that on August 2, 1974, he was still attempting to borrow additional funds.

On August 6, 1974, George Bruso spoke with the attorney in charge of the Natural Resources section of the Attorney General's office and learned that he had misinterpreted the Attorney General's opinion on which his revocation of plaintiff's salvage permit was based. The same day, Bruso called plaintiff's attorney and informed him that defendant was returning to its earlier non-objection posture. Bruso also confirmed defendant's change of position in a letter dated August 12, 1974.

Bill testified that, by this time, he had exhausted all the available funds for the project and was unable to borrow more. The money had been used to pay the crew and rentals and upkeep on the equipment during the period that the project was halted by defendant's actions. By the time defendant reinstated its permission, plaintiff was "broke". Plaintiff salvaged no more steel, and for

all the record reveals, the Monrovia's cargo is still at the bottom of Lake Huron.

Defendant argues on appeal that it is immune from liability because its determination to approve or disapprove the salvaging of materials located on the state's land is a governmental function.

It is unnecessary to address the parties' arguments regarding the proprietary function exception to governmental immunity because, under *Parker v City of Highland Park,* 404 Mich 183; 273 NW2d 413 (1978), defendant's activity was not a governmental function. Under *Parker, supra,* the term "governmental function" is limited to those activities *sui generis* governmental—of essence to governing.

George Bruso testified that he was protecting the property rights of the State of Michigan when he revoked the non-objection permit:

"I had interpreted an attorney general's opinion, which was issued on April 1, in regards to the salvage of the property on the Great Lakes to say that these abandoned particles on the bottom of the Great Lakes belonged to the people of the State of Michigan. And it began to nag me and my conscience began to bother me that I was not fulfilling my duty to the people. I believed they should be getting some benefits from the cargo that I believed belonged to them in the form of royalties or something. We should not be just giving this away, that they should derive some benefit."

The protection of the state's property is not an activity "of essence to governing". Rather, it is an activity in which all property owners stand on the same footing. In protecting its property rights the state's acts are no different than those of private property owners. Therefore, we hold that defendant is not protected by sovereign immunity.

Defendant next argues that the evidence does not establish a tortious interference with plaintiff's contractual rights or economic expectancies. It is true that knowledge of the contract is a prerequisite to liability for tortious interference with a contract. *Dassance v Nienhuis,* 57 Mich App 422, 433; 225 NW2d 789 (1975).

However, the trial court found a tortious interference with an economic expectancy. This tort does not require the existence or knowledge of a contract. See, 1 Harper & James, The Law of Torts, § 6.11, pp 510-514. See also, 45 Am Jur 2d, Interference, § 50, pp 322-323. The evidence supports the trial court's finding of a tortious interference.

Defendant also argues that the acts of defendant and its employee, George Bruso, were not the cause of plaintiff's failure to fulfill its contractual obligations since the project was doomed to failure.

The trial court found that defendant's acts resulted in plaintiff's financial ruin and the foundering of the entire project.

We hold that the court's finding was not clearly erroneous. GCR 1963, 517.1. The evidence showed that plaintiff had the requisite equipment on site and a diving crew mobilizing when defendant revoked the non-objection permit. In addition, the testimony established that the weather was excellent in late July and August of 1974. While defendant's expert, Russell Light (plaintiff's disgruntled and unpaid diver), testified that it would have taken plaintiff an additional six to nine months to remove the remaining steel, Lawrence Thorne, a veteran seafarer with salvage experience and who captained plaintiff's tug boat at the beginning of the operation, testified that, with the new crane, salvage could have been completed within 30 to 45

days, even if the crews were only able to work every fourth day. Also, George Wiswell, plaintiff's new diver, promised to complete the operation in 20 days or less.

Finally, defendant argues that the trial court erred in awarding plaintiff the value of the steel remaining on the S.S. Monrovia, totaling $494,000.

The trial court found defendant liable for a tortious interference. In this state, the general rule for ascertaining damages in tort was stated in *Sutter v Biggs,* 377 Mich 80, 86; 139 NW2d 684 (1966):

"The general rule, expressed in terms of damages, and long followed in this State, is that in a tort action, the tort-feasor is liable for all injuries resulting directly from his wrongful act, whether foreseeable or not, provided the damages are the legal and natural consequences of the wrongful act, and are such as, according to common experience and the usual course of events, might reasonably have been anticipated. Remote, contingent, or speculative damages are not considered in conformity to the general rule."

Since defendant's acts caused failure of the project, plaintiff was deprived of the steel remaining to be salvaged. Limiting plaintiff's damages to lost profits would be unjust, for profits were calculated on the assumption that a half-million dollars worth of steel would offset expenses (most of which were already incurred at the time of defendant's acts). Thus, the trial court properly used the value of the remaining steel as the basic measure of damages. However, we hold that the court erred in disregarding the cost of completing the salvage operations.

Since the verdict exceeds the amount shown by the evidence, this case presents a situation appro-

priate for *remittitur.* GCR 1963, 820.1(7), *Hartough v Safeway Lines, Inc, (On Rehearing),* 288 Mich 703; 288 NW 307 (1939).

We adopt plaintiff's use of a 20-day period to complete salvage operations.[1] In that 20-day period plaintiff would have incurred expenses totaling $107,164.80: wages, ship's money and miscellaneous items for this period would amount to $22,500;[2] equipment rental would amount to $21,664.80;[3] and the divers would receive $63,000.

Accordingly, plaintiff shall have the option to remit $107,164.80 or demonstrate in a hearing, by proof satisfactory to the trial court, that the cost of raising the remaining steel would have been different from the amount estimated herein.

Remanded for proceedings not inconsistent with this opinion. No costs, neither party having prevailed in full.

---

[1] Peter Bill testified as to the cost of completion based on the 20-day contract period with George Wiswell. Captain Thorne estimated 30-45 days, working only every fourth day, while Russell Light estimated six to nine months. The 20-day period would result in the largest verdict supported by the evidence.

[2] Bill testified that the tug crew, a crane operator and a welder drew $975 per day. Bill indicated that ship's money (*i.e.,* food costs) amounted to $100 per day and miscellaneous breakage and supplies would amount to $1,000 for the 20-day period.

[3] Bill testified that the tug boat would cost $13,332 for the 20-day period ($666.60 per day) and the barge would cost $5,332.80 ($266.64 per day). Plaintiff's exhibit 11 reflects a monthly crane rental of $4,500 or $150 per day. Thus, the 20-day cost would be $3,000.