YOUNG v NANDI

Docket No. 266261. Submitted May 8, 2007, at Detroit. Decided June 12, 2007, at 9:10 a.m. Leave to appeal sought.

Daniel A. Young, as personal representative of the estate of Patricia J. Young, deceased, brought a wrongful death action in the Oakland Circuit Court, Rudy J. Nichols, J., against Partha Shanker Nandi, M.D., Sante Bologna, M.D., and others, alleging that the decedent died as a result of the failures of the defendant doctors to properly diagnose and treat her intestinal ischemia. The jury found in favor of the plaintiff and a judgment awarding damages was entered. The defendant doctors and defendant Center for Digestive Health, an assumed name for Troy Gastroenterology, P.C., appealed, claiming, in part, that the trial court erred with regard to the awards for noneconomic damages and attorney fees and that the plaintiff's counsel's conduct at trial denied the defendants a fair trial.

The Court of Appeals *held*:

1. MCL 600.1483, which imposes noneconomic damages caps, applies in wrongful death actions premised on medical malpractice claims. Whether the lower or the higher noneconomic damages cap provided in § 1483(1) applies in any given action alleging medical malpractice depends on the facts of the case. To recover noneconomic damages in excess of the lower $280,000 cap and not exceeding the $500,000 higher cap, the plaintiff in a wrongful death case premised on medical malpractice had to have suffered a qualifying injury, as provided in § 1483(1), and the qualifying injury had to have occurred before the death of the plaintiff. The death of the plaintiff before a judgment is entered does not defeat the claim.

2. Expert testimony is not required to establish that the injured party suffered one of the qualifying injuries for which the higher cap may be applied. The trial court is the finder of fact regarding whether a qualifying injury was sustained.

3. Any error in this case that occurred when the jury was asked to consider whether the defendant's malpractice caused the decedent to suffer a qualifying injury was harmless.

4. The evidence does not support the trial court's imposition of the higher cap. The plaintiff failed to present persuasive evidence to support a finding that the decedent suffered the qualifying injury of permanently impaired cognitive capacity before she died. The award, based on the higher cap, must be reversed and the matter must be remanded for the purpose of imposing the lower cap on the noneconomic damages award.

5. The conduct of the plaintiff's counsel did not deny the defendants a fair trial.

6. An improper extraneous influence did not occur when plaintiff's counsel gave each juror a packet of medical records containing exhibits that were already admitted as evidence and to which counsel referred during the trial.

7. The trial court did not abuse its discretion in determining that although the plaintiff did not strictly comply with the notice requirements contained in MCL 600.6303 by giving the decedent's health insurer notice within 10 days after the verdict, the health insurance benefits paid on the decedent's behalf should not be considered collateral source benefits under the statute because the plaintiff complied with the overall statutory purpose by notifying the insurer of the litigation before the verdict and the insurer asserted its lien rights.

8. The amount of attorney fees awarded as case evaluation sanctions under MCR 2.403(O)(6)(b) was reasonable and was not an abuse of the trial court's discretion. Although some documentation is needed to enable a trial court to make the determination regarding the amount of such an award, a detailed bill of costs is not required.

Affirmed in part, reversed in part, and remanded for further proceedings.

1. NEGLIGENCE — WRONGFUL DEATH — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES CAPS.

   The noneconomic damages caps on awards imposed by statute apply in wrongful death actions premised on medical malpractice; whether the higher or the lower cap applies depends on the facts of the case (MCL 600.1483[1]).

2. NEGLIGENCE — WRONGFUL DEATH — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES.

   A plaintiff has to have suffered a qualifying injury before the plaintiff may recover damages for noneconomic damages in a medical malpractice action in excess of $280,000 and not exceeding $500,000; a plaintiff in a wrongful death action premised on

medical malpractice must have suffered the qualifying injury before the death occurred in order to recover that amount, and the plaintiff's death before a judgment does not defeat the claim; the decedent is the "plaintiff" with respect to whether the plaintiff in a wrongful death action premised on medical malpractice suffered a qualifying injury (MCL 600.1483[1]).

3. NEGLIGENCE — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES — EVIDENCE.

Expert testimony is not necessary to establish that the plaintiff in a medical malpractice action suffered an injury to which the higher cap on noneconomic damages provided by statute applies; the trial court is the finder of fact with regard to whether the plaintiff suffered such a qualifying injury (MCL 600.1483[1]).

4. NEGLIGENCE — MEDICAL MALPRACTICE — WORDS AND PHRASES — PERMANENTLY IMPAIRED COGNITIVE CAPACITY.

A plaintiff who, as a result of the negligence of one or more of the defendants, suffers damage to or diminishment of his or her mental ability to perceive, memorize, judge, or reason that is permanent and renders the plaintiff incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal daily living has "permanently impaired cognitive capacity" for purposes of the application of the higher statutory cap on noneconomic damages in a medical malpractice action (MCL 600.1483[1]).

*Mark Granzotto, P.C.* (by *Mark Granzotto*), and *Marietta S. Robinson*, for the plaintiff.

*Collins, Einhorn, Farrell & Ulanoff, P.C.* (by *Noreen L. Slank* and *Regina T. Delmastro*), and *Plunkett & Cooney, P.C.* (by *Mary Massaron Ross*), for the defendants.

Before: CAVANAGH, P.J., and JANSEN and BORRELLO, JJ.

PER CURIAM. This case arises from the death of Patricia Young, who the jury concluded died as a consequence of the failures of Dr. Partha Shanker Nandi and Dr. Sante Bologna, of the Center for Digestive Health, an assumed name for Troy Gastroenterology, P.C., to

properly diagnose and treat her intestinal ischemia. This conclusion is not challenged on appeal; rather, the issues on appeal relate to (1) the awards of noneconomic damages and attorney fees, (2) whether plaintiff's counsel's conduct denied defendants a fair trial, and (3) whether *Apsey v Mem Hosp (On Reconsideration)*, 266 Mich App 666; 702 NW2d 870 (2005), rev'd 477 Mich 120 (2007), should have been given retroactive application. Only one of these issues warrants appellate relief in this appeal as of right.

First, defendants argue on appeal that the lower noneconomic damages cap provided by MCL 600.1483(1) applies in all wrongful death actions. We disagree and reject defendants' arguments in support of their position as untenable, unfair, and unintended by the Legislature, as did our Supreme Court in *Shinholster v Annapolis Hosp*, 471 Mich 540; 685 NW2d 275 (2004), when faced with the same argument.

Whether the higher medical malpractice noneconomic damages cap, MCL 600.1483(1), can apply to cases brought under the wrongful death act, MCL 600.2922, presents an issue of statutory construction, i.e., a question of law, that is reviewed de novo. *Jenkins v Patel*, 471 Mich 158, 162; 684 NW2d 346 (2004).

It is uncontested that MCL 600.1483, which imposes noneconomic damages caps, applies to wrongful death actions premised on medical malpractice claims. See *Jenkins*, *supra* at 173. But, there are two caps—one limiting damages to $280,000 and one limiting damages to $500,000. The higher limit cap only applies if certain injuries resulted from the negligence. Defendants claim that those injuries—permanent functional loss of at least one limb because of brain or spinal cord injury, or permanently impaired cognitive capacity—could not happen in a wrongful death case for three reasons.

First, the injuries could never happen because an "estate" is the "plaintiff" and it cannot suffer "injuries." Second, the statute uses present tense language and, thus, requires that the injured party continue to suffer those injuries, i.e., be alive, at the time of judgment. And, third, the Legislature eliminated "death" as a cap exception when it amended § 1483.

But, defendants are stretching the limits of reason with these purported justifications for prohibiting the application of the higher cap in wrongful death actions. Our Supreme Court, albeit through several opinions, rejected all of these same or similar arguments in *Shinholster, supra,* and held that the higher cap may apply in medical malpractice cases. Justice MARKMAN authored the lead opinion that held that the higher cap applied in that case and, with regard to this issue, Justice WEAVER, in a separate opinion, joined the reasoning and the result of the lead opinion. See *Shinholster, supra* at 559-568. Justices CAVANAGH and KELLY, in a separate opinion, concurred in result only with the lead opinion with regard to this issue, in keeping with their dissenting opinion in *Jenkins, supra* at 180, where they opined that the Legislature did not intend for *any* damages cap to be applied in wrongful death cases. Chief Justice CORRIGAN, joined by Justices TAYLOR and YOUNG, in a separate opinion, dissented with regard to this issue and would have held that the higher tiered damages cap could not apply in wrongful death actions because death is not one of the enumerated exceptions to the application of the lower cap. *Shinholster, supra* at 582-583; 589-594.

Plurality opinions in which no majority of the participating justices agree with respect to the reasoning for the holding are not generally considered authoritative interruptions that are binding under the doctrine

of stare decisis. See *Negri v Slotkin*, 397 Mich 105, 109; 244 NW2d 98 (1976). However, in *Shinholster* four justices of the Supreme Court rejected the proposition that the higher tiered damages cap could not apply in wrongful death actions—which is precisely defendants' argument. As this Court reasoned in *People v Scarborough*, 189 Mich App 341, 344; 471 NW2d 567 (1991), when a similar situation arose, it would be a waste of judicial resources to disregard the *Shinholster* lead opinion entirely and thus we turn to it for persuasive guidance.

With regard to defendants' first claim, that the "plaintiff" in a wrongful death case for purposes of MCL 600.1483(1) is the estate, not the decedent, the lead opinion in *Shinholster*, with Justices CAVANAGH, WEAVER, and KELLY, in separate opinions, joining with regard to this issue, considered a very similar argument and rejected it. There the Court interpreted the term "plaintiff" in MCL 600.6311, a statute that provides an exception to the rule that future damages be reduced to gross present value if the "plaintiff" is at least 60 years old at the time of judgment. *Shinholster*, *supra* at 568-569. The Court compared other provisions of the Reversed Judicature Act, particularly the comparative fault provision of MCL 600.6306(3) (which provides for the reduction of a judgment "by an amount equal to the percentage of plaintiff's fault") and MCL 600.6305(2) (which, in the event of death, provides for "the calculation of future damages . . . based on the losses during the period of time the plaintiff would have lived but for the injury"). *Shinholster*, *supra* at 570-571. Holding that the term "plaintiff" must be considered in context, and not in a vacuum, the Court concluded that the "plaintiff" for purposes of § 6311 was the decedent, not the estate, in that wrongful death case. *Id.*

A similar analysis applies here. MCL 600.1483(1) specifically references the application of § 6304, the statute that requires the determination of "[t]he percentage of the total fault of all persons that contributed to the death or injury, including each plaintiff . . . ." MCL 600.6304(1)(b). As the lead opinion in *Shinholster* noted, that determination of fault results in a reduction of the total judgment under MCL 600.6306(3). Thus, the "plaintiff" to which § 6304 and § 6306(3) refer must be the decedent in the wrongful death case because neither a personal representative nor an estate would be evaluated for comparative negligence purposes in a wrongful death case. See *Shinholster, supra* at 570-571. It naturally follows then that the "plaintiff" to which § 1483 refers is also the decedent. In other words, considered in context, it is the decedent who is considered with respect to whether the "plaintiff" suffered a permanent functional loss of a limb as a result of brain or spinal cord injury or permanently impaired cognitive capacity. See MCL 600.1483(1). In the same way, it is the decedent who is considered in determining whether the "plaintiff" was comparatively negligent with respect to his or her fatal injuries for which a reduction of damages would be appropriate. The decedent is not considered the "plaintiff" only for comparative fault purposes. Therefore, this argument—that an estate is the only "plaintiff" in a wrongful death case—is rejected.

Defendants also claim that the use of the present tense in the statute, i.e., "[t]he plaintiff has permanently impaired cognitive capacity," means that the impairment must continue to exist at the time of judgment to warrant application of the higher cap. Again, the *Shinholster* lead opinion is persuasive on this issue. The lead opinion stated that the use of the present tense meant that "[a]s long as, at some point

after the defendant's alleged negligence occurred and before the decedent's death, it could be said that, 'as a result of the negligence of 1 or more of the defendants' " the plaintiff suffered one of the qualifying injuries, the higher damages cap tier applies. *Shinholster, supra* at 562. It was also noted that this interpretation of the present tense text was consistent with the Court's conclusion in *Michalski v Bar-Levav*, 463 Mich 723, 732-733; 625 NW2d 754 (2001), that the present-tense words used in the Handicappers Civil Rights Act, MCL 37.1101, referred to events existing during the pendency of the plaintiff's employment—the period at issue in that case. *Shinholster, supra* at 563.

The lead opinion in *Shinholster* also rejected the "present tense" argument on three more grounds, including, first, that the wrongful death act, MCL 600.2922(6), provided at that time that the deceased's estate may recover "reasonable compensation for the pain and suffering, while conscious, undergone by the deceased person during the period intervening between the time of the injury and death . . . ." *Shinholster, supra* at 564. Thus, the Legislature intended that the estate recover everything that the decedent would have been able to recover had he or she lived. *Id.* at 564-565. Second, the "reasonable compensation" referred to by § 2922(6) may sometimes be in excess of the lower cap, as the Legislature concluded by providing for a higher cap, and such "reasonable compensation" would be prevented by a decision that the higher cap could never be applied in wrongful death cases. *Shinholster, supra* at 565. And, third, the lead opinion in *Shinholster* rejected the temporal requirement that the injured party continue to suffer the injury at the time of judgment because such an interpretation is inconsistent with the statutory language and because if that is what the Legislature intended, it would have included

such a requirement. *Id.* at 565-566. For all or any of these grounds, we conclude that the use of the present-tense text does not require that the injured party, who suffered the qualifying injury, survive until judgment is entered. Thus, this argument is rejected.

Finally, defendants argue that because the Legislature eliminated death as a cap exception when it amended MCL 600.1483 in 1993 to its current form, the higher cap can never apply in wrongful death actions. But, again, the lead opinion in *Shinholster* considered this argument and rejected it on the ground that the former version of MCL 600.1483 was a *single*-tiered cap system. *Shinholster, supra* at 563 n 16. Thus, if death occurred, there was *no* cap on damages. *Id.* The lead opinion noted that the Legislature's intent with the newly formulated two-tiered system was "nothing more than that one of the statute's two caps apply to limit noneconomic damages in every medical malpractice action, including those filed under the wrongful death act." *Id.* The lead opinion rejected the argument that the change meant that death claims always fall under the lower cap, stating "[w]e see no rationale for assuming such a conclusion from the Legislature's actions." *Id.* Again, this analysis is cogent and adopted as our own.

In summary, whether the lower or the higher noneconomic damages cap applies in a given case depends on the facts. As in any action for damages alleging medical malpractice, to recover noneconomic damages in excess of $280,000 the injured party had to suffer a qualifying injury and, in a wrongful death case, the qualifying injury had to occur before death. The death of the injured party before judgment is entered does not defeat the claim. Therefore, defendants' argument that MCL 600.1483(1) prevents the recovery of the higher

cap in all wrongful death cases is rejected. Here, if the personal representative could establish that Young suffered a qualifying injury before her death as a result of the negligence of at least one of the defendants, recovery in excess of $280,000, but not above $500,000, could be allowed.

And, that is defendants' next issue on appeal. Defendants claim that expert testimony is necessary to establish that the injured party, Young in this case, suffered one of the qualifying injuries before the higher cap may be applied. Defendants premise this argument on the ground that expert testimony is necessary to prove breach of the standard of care and causation in medical malpractice cases. Defendant's are correct that expert testimony is necessary to establish those elements of a prima facie medical malpractice action. See *Francisco v Parchment Medical Clinic, PC*, 407 Mich 325, 327; 285 NW2d 39 (1979); *Dykes v William Beaumont Hosp*, 246 Mich App 471, 478-479; 633 NW2d 440 (2001). But, that does not mean that expert testimony is necessary to establish an element of damage. The qualifying injuries set forth in MCL 600.1483(1) are elements of damage that may be available in medical malpractice cases, in addition to the typical elements of damage like pain and suffering, disability and disfigurement, and aggravation of preexisting ailments or conditions. See SJI2d 50.01. The statute does not require such expert testimony.

Defendants have failed to cite any authority in support of the proposition that expert testimony is required to establish these elements of damage. As SJI2d 50.01 provides, "[w]hich, if any, of these elements of damage has been proved is for you to decide based upon evidence and not upon speculation, guess or conjecture." Under Michigan law, recovery is not permitted in tort actions for remote, contingent, or speculative damages.

*Theisen v Knake*, 236 Mich App 249, 258; 599 NW2d 777 (1999). Nonetheless, expert testimony is not required to establish pain, suffering, inconvenience, and other such elements of noneconomic damage because they are within the purview of common knowledge. These findings can be derived from the evidence, which may include expert testimony, but expert testimony is not necessary. See MCL 600.2922(6); *Meek v Dep't of Transportation*, 240 Mich App 105, 121-122; 610 NW2d 250 (2000).

But, under MCL 600.1483(1), even if a jury trial is conducted, the trial court determines whether one of these unique elements of damage exists as a result of a defendant's medical malpractice and, thus, entitles a plaintiff to the higher cap. So, the trial court is the finder of fact with regard to these unique elements of damage. The trial court is presumed to know and follow the law, including that a tortfeasor is only liable for damages resulting directly from his or her wrongful act that are the legal and natural consequences of the wrongful act, and that might reasonably have been anticipated. See *Sutter v Biggs*, 377 Mich 80, 86; 139 NW2d 684 (1966). Thus, defendants have failed to persuade us to conclude that expert testimony is necessary to establish that a qualifying injury under MCL 600.1483(1) was sustained.

Defendants also argue that, in this case, the jury was improperly asked to consider the issue whether defendants' malpractice caused Young to suffer "permanently impaired cognitive capacity rendering her incapable of making independent, responsible life decisions and permanently making her incapable of independently performing the activities of normal daily living." See MCL 600.1483(1). The jury was given no information regarding why it was considering this issue. Nev-

ertheless, MCL 600.6304(5) provides that "[t]he jury shall not be advised by the court or by counsel for either party of the limitations set forth in section 1483 or any other provision of section 1483." Giving defendants the benefit of the doubt, the jury arguably should not have been permitted to consider and decide the specific issue whether Young suffered this particular type of injury. But, even if it was an error, the error was harmless. As plaintiff argues, the trial court considered this argument raised by defendants in a posttrial motion and held that "[t]he Court having considered the evidence presented at trial finds that the negligence as determined by the jury of defendants, at some point, rendered Ms. Young to be incapacitated and come within this [MCL 600.1483(1)(b)] exception." Therefore, no relief on this ground is warranted.

Next, defendants argue that the evidence did not support the trial court's imposition of the higher cap in this case. We agree. The trial court made no findings of fact with regard to this issue. After review of the record evidence, we conclude that plaintiff failed to present persuasive evidence in support of a finding that Young suffered permanently impaired cognitive capacity before she died as the result of the negligence of either or both of the defendant doctors.

MCL 600.1483 provides, in relevant part:

> (1) In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not exceed $280,000.00 unless, as the result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to section 6304, in which case damages for noneconomic loss shall not exceed $500,000.00:

\* \* \*

(b) The plaintiff has permanently impaired cognitive capacity rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living.

Whether a plaintiff has "permanently impaired cognitive capacity" depends on what that phrase means—a matter of statutory interpretation. Ascertaining the Legislature's intent is our goal. *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004). We first examine the words of the statute, assigning them their ordinary and generally accepted meaning. *Grossman v Brown*, 470 Mich 593, 598; 685 NW2d 198 (2004). If the plain and ordinary meaning of the language is clear, judicial construction is neither necessary nor permitted. *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005).

Because the statute does not provide its own glossary, we may consult dictionary definitions for guidance. *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). First, the meaning of the word "permanent" includes "existing perpetually; everlasting." *Random House Webster's College Dictionary* (1997). The meaning of the word "impaired" includes "weakened, diminished, or damaged." *Id*. The meaning of the word "cognitive" includes "of or pertaining to the mental processes of perception, memory, judgment, and reasoning, as contrasted with emotional and volitional processes." *Id*. And, the meaning of the word "capacity" includes the "power of receiving impressions, knowledge, etc.; mental ability." *Id*.

Considered together, then, the meaning of "permanently impaired cognitive capacity" includes damage to or diminishment of one's mental ability to perceive,

memorize, judge, or reason that is expected to last forever. Turning back to MCL 600.1483(1)(b), to establish this qualifying injury the plaintiff must suffer damage to or diminishment of his or her mental ability to perceive, memorize, judge, or reason that is permanent "rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living." *Id.* And, this permanently impaired cognitive capacity must be "the result of the negligence of 1 or more of the defendants . . . ." MCL 600.1483(1).

In this case, plaintiff failed to set forth any evidence establishing that Young suffered permanent damage to or diminishment of her mental abilities to perceive, memorize, judge, or reason that rendered her "incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living" as the result of the negligence of either or both of the defendant doctors. Although Young died, death itself is not this qualifying injury.

Plaintiff argues on appeal that because Young was on a ventilator and medically sedated, she suffered the requisite impaired cognitive capacity. Plaintiff also appears to argue that, during the course of her decline, Young was not able to make medical decisions on her own behalf, which was evidence of her impaired cognitive capacity. Neither of these arguments tends to establish that Young suffered permanently impaired cognitive capacity within the contemplation of the statute. But for her clinical decline and the associated or necessary medical interventions, the evidence did not suggest that Young suffered damage to or diminishment of her mental ability to perceive, memorize, judge, or

reason that was expected to be permanent. For example, there was no evidence to suggest that, if Young had lived, she would have been incapable of making independent, responsible life decisions and that she would have been permanently incapable of performing the activities of normal, daily living. That she may have temporarily or unnaturally experienced impaired cognitive capacity at some point before her death does not establish entitlement to the higher noneconomic damages cap. Therefore, we reverse the trial court's award that was based on this higher cap and remand the matter for the purpose of imposing the lower cap on the noneconomic damage award pursuant to MCL 600.1483(1).

Next, defendants argue that their motion for a new trial should have been granted because they were denied a fair trial by plaintiff's counsel's misconduct. We disagree. The denial of a motion for a new trial is reviewed for an abuse of discretion. *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001).

Defendants raise several claims of purported misconduct by plaintiff's counsel that allegedly tainted the proceedings to the point that reversal is required. This purported misconduct primarily involves plaintiff's counsel's implications at various points in the trial that the defendant doctors were not worthy of belief and that their experts were not to be trusted. We have reviewed all of defendants' claims and the extensive record in this matter and conclude that defendants were not denied a fair trial on this ground. The witnesses were not subjected to personal attacks and unsubstantiated insinuations that were designed to prejudice the jury and divert its attention from the real issues. See *Wayne Co Bd of Rd Comm'rs v GLS LeasCo*, 394 Mich 126, 134; 229 NW2d 797 (1975).

Defendants' reliance on *Badalamenti v William Beaumont Hospital-Troy*, 237 Mich App 278, 290; 602 NW2d 854 (1999), in support of their position is far-reaching in this case that did not involve nearly the quantity or quality of improper conduct at issue in that case. See *id.* at 290-291. For instance, plaintiff's counsel did not "repeatedly and with no basis in fact accuse[] defendants and their witnesses of engaging in conspiracy, collusion, and perjury to cover up their alleged malpractice." See *id.* at 290. Plaintiff's counsel did not "continually" accuse defense witnesses of fabricating the defense or repeatedly belittle defense witnesses, suggesting that they destroyed, altered, or suppressed evidence. See *id.* at 291. Plaintiff's counsel did not repeatedly argue that money and greed were defendants' prime motivation or imply that defendants hired a "dream team" to cover up their mistakes. See *id.* In short, there is a laundry list of egregious misconduct involved in the *Badalamenti* case that did not come close to occurring in this case. Here, it cannot be said that plaintiff's counsel's obvious mission was "to divert the jurors' attention from the merits of the case and to inflame the passions of the jury." See *id.* at 292.

Defendants' complaint about plaintiff's counsel's demeanor is not persuasive. That her demeanor was unfriendly or even nasty at times probably did her more harm than good. As our Supreme Court noted in *Firchau v Foster*, 371 Mich 75, 78; 123 NW2d 151 (1963), "[t]he common experience seems to be that such breaches of good manners are more detrimental to the actor than the accused." In short, the trial court has a duty to assure that the parties receive a fair trial. A fair trial was had by both sides in this case. We also note that the trial court was especially vigilant in responding to objections raised by both sides and that curative instructions were provided where necessary and proper.

Defendants further claim they were denied a fair trial because plaintiff's counsel gave each juror a packet of medical records that she referred to during the trial. Defendants argue that this packet constituted an improper extraneous influence because it emphasized only certain records to the exclusion of others. Defendants' objection at trial to the medical record packet challenged its completeness. But, defendants admit that all the medical records contained in the packet were admitted into evidence. Defendants rely on *People v Budzyn*, 456 Mich 77; 566 NW2d 229 (1997), in support of their claim that the packet was an improper "extraneous influence." But, in *Budzyn*, the primary extraneous influence was a movie shown to the jurors during their leisure time. See *id.* at 92-97. Here, the jurors were merely given copies of the exhibits that were already admitted as evidence for their convenience so that they could follow the witnesses' testimonies. Defendants have failed to cite any legal support for their claim that the packet constituted an improper extraneous influence.

Next, defendants argue that health care insurance benefits paid on Young's behalf should have been considered collateral source benefits under MCL 600.6303 because plaintiff did not comply with the statute's notice requirements. After review de novo of this question of law, we disagree. See *Markley v Oak Health Care Investors of Coldwater, Inc*, 255 Mich App 245, 249; 660 NW2d 344 (2003).

MCL 600.6303 provides, in relevant part:

> (1) In a personal injury action in which the plaintiff seeks to recover for the expense of medical care . . . or other economic loss, evidence to establish that the expense or loss was paid or is payable, in whole or in part, by a collateral source shall be admissible to the court in which the action was brought after a verdict for the plaintiff and before a

judgment is entered on the verdict. Subject to subsection (5), if the court determines that all or part of the plaintiff's expense or loss has been paid or is payable by a collateral source, the court shall reduce that portion of the judgment which represents damages paid or payable by a collateral source by an amount equal to the sum determined pursuant to subsection (2). This reduction shall not exceed the amount of the judgment for economic loss or that portion of the verdict which represents damages paid or payable by a collateral source.

* * *

(3) Within 10 days after a verdict for the plaintiff, plaintiff's attorney shall send notice of the verdict by registered mail to all persons entitled by contract to a lien against the proceeds of plaintiff's recovery. If a contractual lien holder does not exercise the lien holder's right of subrogation within 20 days after receipt of the notice of the verdict, the lien holder shall lose the right of subrogation. This subsection shall only apply to contracts executed or renewed on or after the effective date of this section.

(4) As used in this section, "collateral source" means benefits received or receivable from an insurance policy; benefits payable pursuant to a contract with a health care corporation . . . . Collateral source does not include life insurance benefits or benefits paid by a person, partnership, association, corporation, or other legal entity entitled by law to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages. Collateral source does not include benefits paid or payable by a person, partnership, association, corporation, or other legal entity entitled by contract to a lien against the proceeds of a recovery by a plaintiff in a civil action for damages, if the contractual lien has been exercised pursuant to subsection (3).

In this case, it is uncontested that the health care insurer asserted its contractual lien against the proceeds of the lawsuit on October 23, 2003, and the jury verdict was rendered on June 15, 2005. But, after the

jury verdict was rendered, plaintiff failed to provide notice "to all persons entitled by contract to a lien against the proceeds of plaintiff's recovery." MCL 600.6303(3). Thus, according to defendants, the health insurance benefits are considered a collateral source entitling them to a reduction of the judgment by the amount the health care insurer paid—$51,446.16—even though plaintiff will still have to recognize and satisfy the insurer's lien.

Defendants' legal position has been rejected by our Supreme Court in *Rogers v Detroit*, 457 Mich 125, 155-156; 579 NW2d 840 (1998), overruled on other grounds in *Robinson v Detroit*, 462 Mich 439, 468 (2000). In *Rogers*, the plaintiff did not notify several contractual lienholders within 10 days of the jury verdict because she gave notice before the verdict. The defendants sought setoffs for failure to strictly comply with MCL 600.6303(3), but the trial court refused the setoffs. The Supreme Court agreed, holding that nothing in MCL 600.6303(3)

> expressly forbids a trial judge from extending the period or recognizing "notice" occurring before the verdict. The judge did not abuse his discretion in this case. The statute also does not deprive a trial court of the authority to recognize that substantial compliance occurred in this case. The law does not require that a lienholder lose its substantive rights. It does not provide a tortfeasor with a windfall, just because lien rights were exercised at a different time than within the statutory ten-day window.
>
> A statute is to be construed to avoid inflicting hardship or reaching an unjust or unreasonable result. Here, we conclude that the overall statutory purpose was fulfilled: to avoid giving plaintiff either a double recovery or a double liability. To that end, the spirit and purpose of the legislation must prevail over the strict letter of the law. [*Rogers, supra* at 156-157 (citation omitted).]

By the rule of stare decisis, we reach the same result in this case. "The rule of stare decisis generally requires courts to reach the same result when presented with the same or substantially similar issues in another case with different parties." See *W A Foote Mem Hosp v City of Jackson*, 262 Mich App 333, 341; 686 NW2d 9 (2004). Here, plaintiff notified the health care insurer of the litigation before the verdict and the insurer asserted its lien rights. The trial court concluded that the overall statutory purpose was fulfilled and that decision does not constitute an abuse of discretion. See *Rogers, supra.*

Defendants argue that *Rogers, supra*, has no precedential value despite the fact that it was overruled on grounds wholly distinct from the collateral source issue. But, defendants fail to provide legal support for this position. Instead, they have only argued that when the Supreme Court reverses a decision on the basis of one issue and does not specifically address a second issue in the case, no rule of law remains from the decision. But, even if that is true, it does not mean that when the Supreme Court reverses on the basis of one issue in a case that *it* previously decided that no useful rationale remains with regard to any other issue addressed in that case. In fact, the Supreme Court itself cites cases that it has "overruled in part on other grounds" to support its rationale. See, e.g., *People v Anstey*, 476 Mich 436, 448; 719 NW2d 579 (2006); *Mayberry v Gen Orthopedics, PC*, 474 Mich 1, 2 n 1; 704 NW2d 69 (2005).

Defendants next argue that the amount of attorney fees awarded in plaintiff's favor as case evaluation sanctions under MCR 2.403(O)(6)(b) was unreasonable and constituted an abuse of discretion. We disagree. See *Zdrojewski v Murphy*, 254 Mich App 50, 72; 657 NW2d 721 (2002); *Maryland Cas Co v Allen*, 221 Mich App 26, 32; 561 NW2d 103 (1997).

Under MCR 2.403(O)(6)(b), "a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation" is considered an "actual cost" and is permitted as case evaluation sanctions. See, also, MCR 2.403(O)(1). In this case, plaintiff's counsel requested $375 an hour but was awarded $250 an hour. Defendants do not argue that this constituted an unreasonable hourly rate in violation of MCR 2.403(O)(6)(b).

It appears that defendants are challenging whether the fees were for necessary services because defendants are contesting the lack of specificity with regard to plaintiff's attorney's requested fees. In particular, defendants claim that "[t]he trial court erred in awarding attorney fees on the basis of time records that were not itemized with sufficient particularity, including 80 hours labeled only 'trial prep' and 127.6 labeled only 'trial prep and trial.' " As the trial court noted, defendants have failed to cite caselaw that requires any certain specificity with regard to the time records submitted in support of a request for case evaluation sanctions.

Instead, defendants cite *B & B Investment Group v Gitler*, 229 Mich App 1, 15-16; 581 NW2d 17 (1998), in support of their claim that the trial court should have held "an evidentiary hearing before approving the bill of costs." But, that case involved an award of attorney fees for contempt proceedings in a statutorily based slander of title action, not an award of attorney fees as case evaluation sanctions. In fact, in *Badiee v Brighton Area Schools*, 265 Mich App 343, 375-376; 695 NW2d 521 (2005), this Court considered and rejected a similar challenge premised on specificity grounds, holding:

We note that for ordinary taxation of costs, the court rules require that a prevailing party submit a bill of costs that lists costs with particularity within twenty-eight days of the entry of judgment. See MCR 2.625(F) and (G). However, MCR 2.403, by contrast, does not provide specific requirements for the "request" for sanctions. MCR 2.403(O). While MCR 2.625 deals only with costs, MCR 2.403 allows as sanctions "actual costs," which are defined as "those costs taxable in any civil action," as well as "a reasonable attorney fee . . . ." MCR 2.403(O)(6). If the court rules required a party seeking case-evaluation sanctions to specify the amount of actual costs with particularity, then MCR 2.403 would specifically provide such a requirement as MCR 2.625 does. Furthermore, MCR 2.403(O)(6)(b) provides that the portion of the "actual costs" representing the "reasonable attorney fee" is to be "based on a reasonable hourly or daily rate *as determined by the trial judge* for services necessitated by the rejection of the case evaluation." (Emphasis added.) By contrast, MCR 2.625 appears to require a detailed bill of costs because the court clerk is empowered to tax costs without a finding of reasonableness by the trial court. MCR 2.625(F). [*Id.*]

The *Badiee* Court concluded that the determination of a reasonable attorney fee was for the trial court and rejected the claim that a "bill of costs" was required to recover attorney fees as case evaluation sanctions. *Id.* at 376. Thus, defendants' argument that a "bill of costs" is required fails.

But, obviously, in order for the trial court to arrive at a reasonable attorney fee award, it must determine what services were actually rendered. Although a detailed bill of costs is not required, some documentation is needed to enable the trial court to determine the proper amount to award. Here, review of plaintiff's counsel's "time record" submitted in support of her claim for attorney fees indicates: (1) about 43 hours were spent in preparing for the first trial date of

January 31, 2005, (2) about 80 hours were spent preparing for the second trial date of May 31, 2005 (including preparing jury instructions, a verdict form, exhibit and witness lists, and motion responses), (3) about 181 hours were spent on the case during the 12-day trial, and (4) the remainder of the submitted time was devoted to preparing for and attending various depositions.

Although plaintiff's counsel did not list exactly what she was doing with regard to her "trial" and "trial prep" submissions, which made up the bulk of her 372 requested hours, lawyers generally know what other lawyers do during "trial" and "trial prep"—review the pleadings, review discovery responses, read depositions, prepare experts, prepare lay witnesses, prepare for cross-examinations, prepare opening and closing arguments, prepare exhibits, attend the trial, and so forth. The list is quite extensive but well known, i.e., there are no surprises. Therefore, an evidentiary hearing was properly denied as unnecessary. See *Giannetti Bros Constr Co v City of Pontiac*, 175 Mich App 442, 450; 438 NW2d 313 (1989). It would be unreasonable to force lawyers, who do not even know if they will be entitled to case evaluation sanctions at the time they are preparing for and attending the trial, to record exactly what they were doing at every "billable" moment. And, it is unnecessary. The trial court can certainly consider the type of case, the length of the trial, the difficulty of the case, the numbers and types of witnesses, as well as other relevant factors, and determine what services were necessitated by the rejection of the case evaluation. We refuse to require an exhaustive and detailed list of the precise service provided at every moment.

And, the court rule does not require it. The court rule merely requires that the attorney fee awarded be rea-

sonable and "based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation." MCR 2.403(O)(6)(b). In this case, additional depositions, trial preparations (twice), and a trial were necessitated by the case evaluation rejection. It was a 12-day medical malpractice trial and 10 of the 17 witnesses were doctors. The case was difficult and required extensive preparations. Plaintiff's counsel provided those associated services. We conclude that the trial court did not abuse its discretion by awarding 372.6 hours because the decision is within the range of reasonable and principled outcomes. See *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). Therefore, defendants are not entitled to appellate relief with regard to this issue.

Finally, defendants argue that this Court should have given *Apsey v Mem Hosp (On Reconsideration)*, 266 Mich App 666; 702 NW2d 870 (2005), retroactive application. However, our Supreme Court recently reversed our decision in *Apsey*, therefore we need not consider this issue. See *Apsey v Mem Hosp*, 477 Mich 120; 730 NW2d 695 (2007).

Affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion. We do not retain jurisdiction.